ROBERTS, J.,
for the Court.
SUMMARY OF THE CASE
¶ 1. On January 11, 2006, a jury sitting before the Leake County Circuit Court found Raymond Moore guilty of burglary. Consequently, the circuit court sentenced Moore to seven years in the custody of the Mississippi Department of Corrections. Aggrieved, Moore appeals and raises three issues, listed verbatim:
I. THE COURT ERRED IN SUSTAINING THE PROSECUTION’S OBJECTIONS TO APPELLANT’S CROSS-EXAMINATION OF JAMES BRYANT PAGE ABOUT DANNY RAY WHITE.
II. THE COURT ERRED IN REFUSING TO PERMIT APPELLANT TO CROSS EXAMINE JAMES BRYANT PAGE, THE PRIMARY PROSECUTION WITNESS ABOUT PAGES UNCON-VICTED CRIMES THAT REFLECTED BADLY ON HIS CREDIBILITY.
*826 III. THE COURT ERRED IN DENYING APPELLANT’S MOTION FOR A DIRECTED VERDICT, IN REFUSING APPELLANT’S REQUEST FOR A PEREMPTORY INSTRUCTION AND IN DENYING APPELLANT’S MOTION FOR A NEW TRIAL. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
FACTS
¶ 2. Moore’s conviction stems from a burglary of the Sturdivant family shed in the Tuscola community in Leake County. The Sturdivant home was surrounded with woods on three sides. Their nearest neighbor was two to three hundred yards away.
¶ 3. Around noon on June 15, 2005, Heather Sturdivant was at home with her two young daughters. Heather saw a small pickup truck drive up to her house. Heather later noticed that the pickup did not have a license plate or a rear bumper. She did not recognize the truck or the two men inside it. One of the men stood out in Heather’s mind because he was missing his arm just below the elbow. Heather remembered that the other man had long sideburns.
¶4. The two men went to Heather’s carport door, rang the doorbell and, by Heather’s description, “banged” on the door. Because Heather was alone with her two daughters and her nearest neighbor was out of sight, Heather was reluctant to answer the door. When the two men did not get a response at the carport door, they went to Heather’s front door. Again, they rang the doorbell and “banged” on the front door. Again, Heather did not answer.
¶ 5. After they tried both doors and got no response, the man with the long sideburns started “going through things” in the storage areas of the Sturdivants’ carport. He then went into a storage room connected to the Sturdivants’ carport. The storage room exited into the Sturdi-vants’ back yard. While the man missing part of his arm stood under the carport, the other man went through the Sturdi-vants’ back yard and walked “up on [Heather’s] back patio.” He then went back through the back yard, through the storage room, and ended up back with his companion under the carport.
¶ 6. Heather heard their truck start. She thought they were leaving. She waited for them to drive by on their way off her property, but she did not see them. Heather concluded that they must have driven to the shed behind her home because she could not see them. They eventually left.
¶ 7. All the while, Heather had a cordless phone. She first called her husband, David Sturdivant, and then called 911. David arrived home first. Deputy Jim Moore of the Leake County Sheriffs Department arrived after David. By that time, the two men were gone. Heather and David discovered that they were missing a Black and Decker drill, a “couple of chainsaws,” a weedeater, a full gas can, a climbing stand used for hunting deer, a deer feeder, a target, and a deer “rattling horn.” Heather also noticed that her cell phone was missing from her Chevrolet Suburban.
¶ 8. On June 17th, Mark Wilcher, a criminal investigator with the Leake County Sheriffs Department, became involved with the ease. Heather described the two men and the pickup. She described the pickup as a small “squared-off’ “tanish” S-10 model pickup. However, Heather was not sure exactly who manufactured the *827 pickup. As a result, Detective Wilcher looked for “an S-10 or a Ranger or a small Dodge pickup that was squared off.” Detective Wilcher never developed a lead from Heather’s description of the pickup.
¶ 9. The Sturdivant home is near the border of Scott County. Detective Wil-cher contacted the Forest Police Department and spoke with Police Chief Mike Lee. After describing the two men, they developed a suspect — Jason Page, an amputee. Page was brought in for questioning. Page also gave a statement and implicated Raymond Moore.
PROCEDURAL HISTORY
¶ 10. On October 31, 2005, the Leake County grand jury returned an indictment against Raymond L. Moore and charged Moore with burglary of a storage shed in violation of Mississippi Code Annotated § 97-17-33. Moore pled not guilty.
¶ 11. Moore’s trial commenced on January 11, 2006. The prosecution called Heather Sturdivant, Detective Wilcher, and Jason Page. Heather testified regarding the events of June 15. Detective Moore testified regarding his investigation and that it led to Page.
¶ 12. At the time of Moore’s trial, Page had pled guilty to burglary at the Sturdi-vant home. The Leake County Circuit Court sentenced Page to a three year sentence with one year suspended. That suspended year was conditional to Page’s truthful testimony at Moore’s trial.
¶ 13. Page testified that, on June 15, 2005, he and Raymond Moore went to the Tuscola community to visit his brother-in-law. Moore drove. Page did not know in whose pickup they traveled. He only knew that Moore supplied the pickup. When they arrived at Page’s brother-in-law’s house, no one was there. Page and Moore decided to return in the direction of Scott County. They stopped at the Sturdi-vant home.
¶ 14. Page testified that it was Moore’s idea to stop at the Sturdivant home. By Page’s description, Moore wanted to get some gas because his tank was nearly empty. Page corroborated Heather’s version of events. Page described how he rang the doorbell and knocked on the door. According to Page, while he knocked on the doors, Moore was at the Sturdivant’s shed. Page also testified that he went back to the truck to smoke a cigarette and that he left Moore under the Sturdivants’ carport for “approximately five to ten minutes.” Afterwards, they “just loaded up the stuff.” When asked what they “loaded up,” Page answered, “[a] chainsaw, a wee-deater and some kind of like hunting stand.” Page also testified that they took a “gas jug.”
¶ 15. According to Page, one of his responsibilities was to sell the things they took. He testified that, on the morning of June 16, he sold the weedeater and the chainsaw for sixty dollars. Page said he and Moore used the money to buy crack.
¶ 16. Page did not notice a drill among the things he and Moore took from the Sturdivant home. However, he testified that, “approximately two weeks later” Moore brought him a drill. Page sold that drill for twenty-five dollars. Again, he and Moore bought crack with the proceeds. The prosecution rested after Page testified.
¶ 17. After an unsuccessful motion for a directed verdict, Moore testified on his own behalf. Moore testified that he was not with Page on June 15 and that he did not take part in burglarizing the Sturdi-vant shed. According to Moore, he did not have a tan pickup and he never borrowed one from anyone. Moore claimed that he was home alone on June 15 and that he waited on his mother to get off work at *828 3:00 p.m. so he could use her car to see his girlfriend. Moore also claimed that Page implicated him in the burglary because Page was covering for someone else. After Moore testified, he called his mother, Vickie Treat. Treat’s testimony was very brief. She merely testified that she once saw Page and his girlfriend hitchhiking and that, at Moore’s request, she gave them a ride. The prosecution did not cross-examine Treat. Afterwards, Moore rested.
¶ 18. The prosecution did not present any rebuttal evidence. After deliberation, the jury found Moore guilty. Two days later, the circuit court sentenced Moore to seven years in the custody of the Mississippi Department of Corrections.
¶ 19. On the very day that Moore was sentenced, he filed a motion for new trial “or other relief.” That same day, the circuit court overruled Moore’s motion. Aggrieved, Moore appeals.
ANALYSIS
I. THE COURT ERRED IN SUSTAINING THE PROSECUTION’S OBJECTIONS TO APPELLANT’S CROSS-EXAMINATION OF JAMES BRYANT PAGE ABOUT DANNY RAY WHITE.
¶ 20. During cross-examination of Detective Wilcher, Moore’s attorney gave Detective Wilcher two photographs and asked Detective Wilcher whether he recognized those photographs as pictures of a man named Danny Ray White. Detective Wilcher testified that an unnamed Forest Police Officer had seen White with Page a few days prior to speaking with Detective Wilcher. Detective Wilcher also testified that White was, at one time, a “person of interest.”
¶ 21. On redirect, the prosecution asked Detective Wilcher whether he investigated White. Detective Wilcher responded that he talked to Page before he could locate White and that, based on discussions with Page, White was eliminated as a suspect. On recross, Detective Wilcher testified that he never spoke to White because “there was no reason to” speak to him.
¶ 22. During direct examination of Page, the prosecution asked Page whether he knew White. Page testified that White was a friend of his and that White was not with him on June 15. On cross-examination, the following exchange occurred:
Q. And how long have you known Danny Ray White?
A. Since I was a kid.
Q. And — uh—I believe you told me that Danny Ray White right now is to your knowledge in the custody of the state of Mississippi?
A. No, sir, I didn’t tell you that.
Q. Okay. Where is he to the best of your knowledge?
BY MR. BROOKS: Your Honor, we object to the relevancy of that? [sic]
A. I don’t know.
BY THE COURT: He said he didn’t know.
Q. You don’t know where he is?
A. No, sir.
Q. Do you remember telling me you thought he had been taken somewhere over to Jackson?
A. No, sir.
Q. This morning—
A. —I didn’t tell you that.
Q. This very morning, you deny that?
BY THE COURT: Now Mr. Collins, what’s—
A. No, sir.
BY THE COURT: Young fellow, when I start talking let me finish my talking. When he makes — someone objects, you let me answer it. What’s the relevancy of this?
BY MR. COLLINS: This was a suspect in the case. Uh — the officer’s testi *829 fied he never questioned him and I would proffer to the Court that this witness told me this morning he was in custody in Jackson.
BY THE COURT: I’m going to sustain the objection. I don’t think it’s relevant at all.
¶23. Moore alleges that the circuit court erred when it prohibited his continued cross-examination. Moore claims his questions as to White’s whereabouts “were certainly relevant to the issue of the identity of Page’s accomplice.” Further, Moore submits that he “should have been allowed free range to cross-examine Page about White ... particularly in light of the fact that Page was the only witness identifying [Moore] as Page’s accomplice.” Moore concludes that, “[n]ot only was the Court’s ruling error, but it was likely particularly damaging.”
¶ 24. We review issues regarding the admission or exclusion of evidence under our familiar abuse of discretion standard. Burton v. State, 875 So.2d 1120(¶ 6) (Miss.Ct.App.2004). We will find an abuse of discretion where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense. Id In other words, we will not disturb the trial court’s decision unless it is clearly wrong. Id.
¶25. Presumably, Moore’s intent was to counteract Page’s testimony that he and Moore burglarized the Sturdivants’ storage shed. By casting blame towards White, Moore hoped to show that Page covered for White and wrongfully named Moore as his companion in the June 15th burglary. The prosecution objected when Moore’s attorney asked Page whether he knew where White was. Though testimony continued for a brief period after the prosecution objected, the entire exchange at issue was centered on White’s whereabouts. Page remained adamant that he did not know where White was and that he did not tell counsel for Moore that White was in some form of custody in Jackson.
¶ 26. Though we are not required to examine the exchange in the light most favorable to Moore, even viewing the prohibited testimony in that light, the excluded testimony at issue is irrelevant. “ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401. Broadly speaking, the ultimate determination is whether Moore burglarized the Sturdivant’s storage shed. Granted, if there was only one person, save Page, who burglarized the Sturdi-vants’ storage shed, and it was not Moore, that would tend to make it less probable that Moore was guilty.
¶ 27. However, Page merely cast a shadow of speculation in suggesting it was White, rather than himself, who was with Page on June 15. Page testified that he and Moore burglarized the Sturdivants. Page denied that White was with him. The excluded testimony was in regards to White’s location as of the time of trial. White’s whereabouts as of January 11, 2006, does not make it less probable that Moore and Page burglarized the Sturdi-vants’ storage shed on June 15, 2005. Accordingly, the excluded testimony was irrelevant and the circuit court got it exactly right.
II. THE COURT ERRED IN REFUSING TO PERMIT APPELLANT TO CROSS EXAMINE JAMES BRYANT PAGE, THE PRIMARY PROSECUTION WITNESS ABOUT PAGES UNCONVICTED CRIMES THAT REFLECTED BADLY ON HIS CREDIBILITY.
¶ 28. Moore’s second issue also stems from his cross-examination of Page. *830 We detailed the standard of review in Moore’s first issue. There is no need to repeat it here.
¶ 29. Moore attempted to ask Page about charges pending against Page. The prosecution objected. Outside of the presence of the jury, the circuit court stated that it would allow cross-examination regarding those pending charges if those charges were, for some reason, pending in consideration of Page’s testimony against Moore.
¶ 30. Counsel for Moore responded that “[his] argument — uh—would be that it goes again to — to his character for truthfulness and veracity would be my point in — in the other charges.” The circuit court stated that it would not allow cross-examination regarding those pending charges for purposes of impeaching Moore’s credibility. The circuit court then reiterated that it would allow further cross-examination if Page’s favorable testimony would somehow affect the outcome of those pending charges. When counsel for Page stated that those charges were in no way related to his testimony against Moore and that the charges were pending in another jurisdiction, the circuit court sustained the prosecution’s objection.
¶ 31. On appeal, Moore claims that the circuit court erred. Moore submits that cross-examination of Page regarding his pending charges was permissible pursuant to M.R.E. 608(b). According to Moore, M.R.E. 608(b) “permits cross-examination for impeachment purposes about unconvicted criminal acts committed by the witness where the subject of the cross examination bears on the credibility of the witness.” Moore adds, “[t]he pending charges were proffered by [his] counsel to reflect on Page’s character for truthfulness.” Moore concludes, “[t]he Trial Court thus refused to let [him] inquire into Page’s prediliction [sic] toward committing crimes that reflected badly on his credibility.”
¶ 32. We disagree. Pursuant to M.R.E. 608(b):
Specific instances of the conduct of a witness, for the purpose of attacking ... his credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative or truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness ....
Moore sought to show that, because Page had some unnamed and otherwise undeveloped unrelated pending charges, it was likely that he was lying about Moore’s involvement in the June 15th burglary.
¶ 33. That Page had some unmentioned and unrelated charges pending is not, in and of itself, probative of untruthfulness. Simply having been charged with some crime, without more, does not make it more likely that a witness is lying. See, e.g., Ellis v. State, 856 So.2d 561(¶ 12) (Miss.Ct.App.2003). Based on the facts and the record before us, we cannot say that the circuit court abused its discretion when it sustained the prosecution’s objection.
III. THE COURT ERRED IN DENYING APPELLANT’S MOTION FOR A DIRECTED VERDICT, IN REFUSING APPELLANT’S REQUEST FOR A PEREMPTORY INSTRUCTION AND IN DENYING APPELLANT’S MOTION FOR A NEW TRIAL. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 34. Moore claims that the verdict was against the weight and sufficiency *831 of the evidence because the indictment only accused him of burglary of the storage shed and there was no testimony that he or Page either burglarized the shed or that items were taken from or missing from it.
¶35. Moore failed to preserve this issue. “Motions for a directed verdict must be specific and not general in nature.” King v. State, 897 So.2d 981(¶ 39) (Miss.Ct.App.2004) “A motion for a directed verdict on the grounds that the state has failed to make a prima facie case must state specifically wherein the state has failed to make out a prima facie case.” Id. “In the absence of such specificity, the trial court will not be put in error for overruling the same.” Id.
¶ 36. After the State rested, Moore’s counsel stated:
The motion’s for a directed verdict, your Honor. We would argue that considering the evidence offered by the State of Mississippi in the light most favorable to the State of Mississippi that the State has wholly failed to meet its burden of proof, that this evidence should be excluded and a verdict of not guilty should be directed for the defendant.
In Moore’s motion for new trial “or other relief,” Moore did not request a JNOV. Moore merely argued that the circuit court should have granted his motion for directed verdict at the conclusion of the State’s case-in-chief. Additionally, Moore’s motion for new trial stated, “the verdict of the Jury in this case was against the overwhelming weight of the evidence presented and was contrary to law.” Moore’s brief, generalized, and conclusory argument failed to distinguish any particular deficiency in the proof, or to assert how the verdict is contrary to the overwhelming weight of the evidence. Accordingly, this issue is procedurally barred. Beckum v. State, 917 So.2d 808(¶ 15) (Miss.Ct.App.2005).
¶ 37. THE JUDGMENT OF THE LEAKE COUNTY CIRCUIT COURT OF CONVICTION OF BURGLARY OF A STORAGE SHED AND SENTENCE OF SEVEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEAKE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.